# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| THREE RP LIMITED PARTNERSHIP, an Oklahoma Limited Partnership, | ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) Case No. 17-CV-36-JHP ) |
| DICK'S SPORTING GOODS, INC., a Delaware corporation, | ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Before the Court are Defendant's Motion to Dismiss (Doc. No. 7), Plaintiff's Motion for Summary Judgment (Doc. No. 12), Defendant's Objections to the Affidavit of James W. Dill (Doc. No. 16), and Defendant's Motion (In the Alternative) for Relief Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure (Doc. No. 17). After consideration of the briefs, and for the reasons stated below, Defendant's Motion to Dismiss is **GRANTED**, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Objections and Motion for Rule 56(d) Relief are **MOOT**.

## BACKGROUND

According to the Petition (Doc. No. 2-1), on September 15, 2014, Defendant Dick's Sporting Goods, Inc. ("DSG") entered into a written lease agreement

("Lease") with landlord Vector Securities Corporation ("Vector") for approximately 40,000 square feet of space in a shopping center known as the Three Rivers Plaza (the "Shopping Center') in Muskogee, Oklahoma. (Doc. No. 2-1, ¶ 3; Doc. No. 7-2 (Lease)). On March 2, 2015, Vector assigned all rights, title, and interest in and to the Lease to Plaintiff Three RP Limited Partnership ("Plaintiff"). (Doc. No. 2-1, ¶ 3). Section 1.6 of the Lease sets forth an "Initial Co-Tenancy Requirement," which requires that certain key stores be open at the Shopping Center, and that a certain portion of the remaining Shopping Center space be occupied by certain types of retailers. (*See id.* ¶¶ 5-13). Plaintiff alleges that, once the Initial Co-Tenancy Requirement is met, Dick's is obligated to commence paying "full rent" under the Lease. (*Id.* ¶ 13).

Section 1.6(a) of the Lease provides in relevant part:

> The **"Initial Co-Tenancy Requirement"** shall mean that: (i)(A) TJ Maxx and (B) one additional retailer satisfying prong (i) of the definition of Required Tenant (set forth below) and operating at least ten thousand (10,000) square feet of LFA in the Shopping Center (the **"Additional Inducement Tenant"**), shall each be open or will simultaneously open with Tenant, fully staffed, stocked and operated as a retail business in substantially all of their respective premises; and (ii) at least seventy percent (70%) of the remaining LFA of the Shopping Center, excluding the LFA of the Demised Premises and any out-parcels, shall be open or will simultaneously be open with Tenant, fully staffed, stocked and operated by an Occupant in substantially all of its premises for the operation of a retail business by a Required Tenant.

(Doc. No. 7-2, at 8). "LFA" is defined in Section 1.2(d) of the Lease as:

2

> the number of gross square feet of leasable floor area (whether occupied or unoccupied) of the Shopping Center Buildings intended for the exclusive use by any tenant, subtenant, assignee, licensee, concessionaire or other occupant of the Shopping Center ('Occupant') thereof, including mezzanines or other levels if used for retail sales . . . .

(Doc. No. 7-2, at 3).

As stated above, Section 1.6(a) sets forth two tests to determine whether the Initial Co-Tenancy Requirement is met. The parties agree that the requirements of Section 1.6(a)(i) are satisfied by the tenancies of TJ Maxx, with 21,858 square feet of leased space, and ULTA Salon and Cosmetics ("ULTA"), with 10,061 square feet of leased space. (*Id.* ¶¶ 7, 10). The parties' dispute centers on the proper construction of Section 1.6(a)(ii), in particular, the meaning of the phrase "at least seventy percent (70%) of the remaining LFA of the Shopping Center." Plaintiff alleges "remaining LFA" describes the total leasable floor area of 111,050 square feet, from which the 40,000 square feet leased to DSG is then deducted. (Doc. No. 2-1, ¶¶ 8, 10). By contrast, DSG asserts "remaining LFA" refers to the total leasable floor area remaining *after* deducting the space leased to the two Inducement Tenants described in Section 1.6(a)(i), from which the space leased to DSG is then deducted. (*Id.* ¶¶ 9, 12).

Plaintiff filed this action against DSG in the District Court of Muskogee County, Oklahoma, seeking a declaratory judgment that Plaintiff's construction of the Initial Co-Tenancy Requirement is correct. (*See* Doc. No. 2-1). DSG then

3

removed the case to this Court based on diversity jurisdiction. (Doc. No. 2). DSG has now moved to dismiss the Petition pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 7). Plaintiff filed a Response in opposition (Doc. No. 11), and DSG filed a Reply (Doc. No. 14). Plaintiff has also filed a Motion for Summary Judgment (Doc. Nos. 12, 13). DSG filed a Response in opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 15), and Plaintiff filed a Reply (Doc. No. 20). With respect to the Motion for Summary Judgment, DSG has filed Objections to the Affidavit of James W. Dill filed by Plaintiff (Doc. No. 16) and a Motion for Relief pursuant to Rule 56(d) of the Federal Rules of Civil Procedure (Doc. No. 17). Plaintiff filed Responses to DSG's Objections and Motion for Rule 56(d) Relief (Doc. Nos. 19, 22). The pending motions are fully briefed and ripe for review.

## DISCUSSION

### I. DSG's Motion to Dismiss

In considering a Rule 12(b)(6) motion, the court must accept all well-pleaded allegations of the complaint as true, and must construe them in the light most favorable to the plaintiff. *See Anderson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 521 F.3d 1278, 1284 (10th Cir. 2008). To withstand a motion to dismiss, a complaint must contain enough allegations of fact "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

570 (2007). The plaintiff bears the burden to frame "a complaint with enough factual matter (taken as true) to suggest" that he or she is entitled to relief. *Twombly,* 550 U.S. at 556. "A pleading that offers 'labels and conclusions' or a formulaic recitation of the elements of a cause of action will not do.'" Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555, 557).

In considering a motion to dismiss, the Court is limited to consideration of specific allegations of the complaint, documents attached to the complaint or incorporated by reference, and documents "central to the plaintiff's claim and referred to into the complaint," at least "where the document's authenticity is not in dispute." *Pace v. Swerdlow*, 519 F.3d 1067, 1072 (10th Cir. 2008) (quoting *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253-54 (10th Cir. 2005)) (quotation marks omitted). Here, the Lease is referred to in the Petition and is central to Plaintiff's claim. Therefore, the Court may consider the indisputably authentic copy of the Lease submitted by DSG in support of its motion to dismiss (Doc. No. 7-2). *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir. 1997) (citing cases).

As explained above, the parties' dispute centers on the proper construction of the Initial Co-Tenancy Requirement of the Lease. In its Motion to Dismiss,

5

DSG asserts Plaintiff's case rests on an illogical interpretation of the Initial Co-Tenancy Requirement, which is contrary to the language of the Lease and canons of construction in contract interpretation. DSG urges the Court to reject Plaintiff's construction of Section 1.6(a). DSG further argues its own interpretation of the Initial Co-Tenancy Requirement is logical and gives meaning to the entirety of Section 1.6(a).

Section 1.6(a) sets forth two requirements in order to meet the Initial Co-Tenancy Requirement. First, as stated in Section 1.6(a)(i), TJ Maxx and an "Additional Inducement Tenant" (*i.e.*, ULTA) must be open or must simultaneously open with DSG. Second, as stated in Section 1.6(a)(ii), "at least seventy percent (70%) of the remaining LFA of the Shopping Center, excluding the LFA of the Demised Premises and any out-parcels, shall be open or will simultaneously be open with Tenant, fully staffed, stocked and operated by an Occupant in substantially all of its premises for the operation of a retail business by a Required Tenant." "Required Tenant" is defined in Section 1.6(a) to include a national Occupant operating a minimum of fifty high quality retail stores, or a regional Occupant satisfactory to DSG in its sole discretion.

Plaintiff alleges the phrase "at least seventy percent (70%) of the remaining LFA of the Shopping Center" refers to 70% of the *total* LFA of the Shopping Center—111,050 square feet. (*See* Doc. No. 2-1, ¶ 10). Under this interpretation,

6

only 70% of the total LFA of the Shopping Center, including TJ Maxx (21,858 square feet) and the Additional Inducement Tenant (*i.e.*, ULTA) (10,061 square feet), and excluding only DSG's "Demised Premises" and any "out-parcels" (40,000 square feet) must be occupied by a Required Tenant in order to satisfy the second requirement of the Initial Co-Tenancy Requirement. As a result, only 17,816 square feet of the LFA in the Shopping Center, in addition to 31,919 square feet of space occupied by TJ Maxx and ULTA, must be open and operated by a Required Tenant to meet the second part of the Initial Co-Tenancy Requirement.[1]

DSG, on the other hand, contends the phrase "remaining LFA" refers to the LFA remaining in the Shopping Center *after* the LFA occupied by TJ Maxx and ULTA is deducted. Under this interpretation, 70% of the total LFA remaining after deducting 31,919 square feet of space occupied by TJ Maxx and ULTA, less the 40,000 square feet occupied by DSG's "Demised Premises" and any "out-parcels," must be open or simultaneously open with DSG to satisfy the second prong. This calculation results in a requirement of 27,392 square feet of LFA to be open and operated by Required Tenants, in addition to the 31,919 square feet of LFA occupied by TJ Maxx and ULTA, in order to satisfy the second part of the

---

[1] Plaintiff's calculation is as follows: 111,050 (Total LFA) - 40,000 (DSG LFA) = **71,050** x 70% = **49,735** - 31,919 (TJ Maxx and ULTA LFA) = **17,816**.

7

Initial Co-Tenancy Requirement.[2] (*See* Doc. No. 2-1, ¶ 12). According to Plaintiff, the difference of interpretation is significant, because DSG "is obligated to commence paying full rent under the Lease once the Initial Co-Tenancy Requirement is met." (*Id.* ¶ 13).

In Oklahoma, "[i]f the terms of a contract are unambiguous, clear and consistent, they are accepted in their plain and ordinary sense and the contract will be enforced to carry out the intention of the parties as it existed at the time it was negotiated." *S. Corr. Sys., Inc. v. Union City Pub. Sch.*, 64 P.3d 1083, 1088 (Okla. 2002) (citations omitted). "If a contract is complete in itself and viewed in its entirety is unambiguous, its language is the only legitimate evidence of what the parties intended." *Id.* at 1089 (citations omitted). In determining the interpretation of a contract, the Court must not "create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on the provision." *Id.* (citations omitted).

Applying these principles, the Court concludes Section 1.6(a) of the Lease is clear, consistent, and unambiguous, and a plain reading of the provision supports DSG's interpretation. By contrast, Plaintiff's reading of Section 1.6(a) is strained and gives no meaning to the critical word "remaining." Accordingly, the Court concludes that dismissal of Plaintiff's Petition is appropriate.

---

[2] DSG's calculation is as follows: 111,050 (Total LFA) - 31,919 (TJ Maxx and ULTA LFA) - 40,000 (DSG LFA) = **39,131** x 70% = **27,392**.

According to a plain reading, the word "remaining" in Section 1.6(a)(ii) refers to the LFA of the Shopping Center "remaining" after removing the LFA occupied by TJ Maxx and ULTA, which is described in Section 1.6(a)(i). As DSG points out, it is logical to read "remaining" as referencing what precedes it, in order to distinguish what "remains." Here, the word "remaining" in Section 1.6(a)(ii) immediately follows the description of TJ Maxx and the Additional Inducement Tenant (*i.e.*, ULTA). Accordingly, the word "remaining" can refer only to the LFA "remaining" after removing the LFA occupied by TJ Maxx and ULTA. From the "remaining LFA of the Shopping Center," DSG's 40,000 square feet of space is excluded, leaving 70% occupancy of 39,131 square feet of LFA, or 27,392 square feet, which must be occupied by Required Tenants.

Plaintiff's differing interpretation of Section 1.6(a) simply ignores the word "remaining" in "remaining LFA," which renders it an improper interpretation under Oklahoma law. "It is well settled that effect should be given, if possible, to every word, phrase, clause, and sentence of a contract." *Cities Serv. Gas Co. v. Kelly-Dempsey & Co., Inc.*, 111 F.2d 247, 249 (10th Cir. 1940) (citation omitted). *See Scrivner v. Sonat Expl. Co.*, 242 F.3d 1288, 1291 (10th Cir. 2001); 15 Okla. Stat. § 157 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others.).

Accordingly, a court cannot simply disregard words or phrases in a contract, which Plaintiff's interpretation of Section 1.6(a) would require.

Plaintiff's arguments in its Response brief are unpersuasive. First, Plaintiff relies on the "doctrine of the last antecedent" in support of its interpretation of Section 1.6(a)(ii). This doctrine provides that a limiting word or clause is to be applied to the immediately preceding word or phrase, and is "not to be construed as extending to or including others more remote." *Bd. of Trustees of Firemen's Relief & Pension Fund of City of Muskogee v. Templeton*, 86 P.2d 1000, 1003 (Okla. 1939) (quotation omitted). "This rule is, however, "merely an aid to construction" and is not to be applied where "the subject matter requires a different construction." *Id.* at 1003-04 (quotation omitted). Plaintiff argues that, by applying this doctrine, the phrase "excluding the LFA of the Demised Premises" must refer to the immediate antecedent phrase, "at least seventy percent (70%) of the remaining LFA of the Shopping Center." Plaintiff argues DSG's interpretation would defy this doctrine, because DSG would have the phrase "excluding the LFA of the Demised Premises" refer back to the "more remote" Section 1.6(a)(i). (Doc. No. 11, at 3).

The Court agrees with Plaintiff's reading of the cited phrases, in that the phrase "excluding the LFA of the Demised Premises" refers back to the antecedent phrase "at least seventy percent (70%) of the remaining LFA of the Shopping

10

Center."  Nonetheless, Plaintiff's reading is incomplete, as it still fails to account for the word "remaining."  And it is natural to read the word "remaining" to refer to its own immediate antecedent, Section 1.6(a)(i).  Further, according to DSG's Reply brief, DSG does not argue that the phrase "excluding the LFA of the Demised Premises" refers to Section 1.6(a)(i), but rather to the immediately preceding phrase, "at least seventy percent (70%) of the remaining LFA of the Shopping Center."  (*See* Doc. No. 14, at 4).  Therefore, the "doctrine of the last antecedent" in fact supports DSG's interpretation of Section 1.6(a).

Second, Plaintiff asserts the semicolon that separates the two subsections of Section 1.6(a) indicates the two clauses are independent clauses that are related but internally complete.  While the Court agrees that a semicolon indicates a separation of two independent clauses, the Court disagrees that the presence of the semicolon means that the two clauses cannot reference each other and must be read completely separately.  The Court must consider the whole of the contract in determining its proper construction and cannot narrowly focus on one provision.  As DSG points out, the Initial Co-Tenancy Requirement consists of two separate tests, which are connected by the word "and."  Because of the presence of the connecting word, it is clear that both requirements in Sections 1.6(a)(i) and 1.6(a)(ii) must be satisfied to meet the Initial Co-Tenancy Requirement.  *See Chessin v. Keystone Resort Mgmt., Inc.*, 184 F.3d 1188, 1195 (10th Cir. 1999)

(holding that statutory provision consisting of two conditions joined by word "and" meant that employer had to "satisfy both conditions"). Plaintiff's argument is without merit.

Third, Plaintiff argues that DSG's interpretation of Section 1.6(a) would redundantly count DSG twice in both Sections 1.6(a)(i) and (ii). Plaintiff contends DSG "would have the Court construe 1.6(a)(i) to include DSG, TJ Maxx and ULTA to determine who must be open, and then include DSG twice in 1.6(a)(ii) by construing 'remaining' to include all three (DSG, TJ Maxx and ULTA), plus DSG a second time under "[]excluding the LFA of the Demised Premises." (Doc. No. 11, at 4-5). However, as DSG notes in its Reply brief, Plaintiff appears to misunderstand DSG's interpretation of the relevant language. DSG argues that Section 1.6(a)(i) describes only when TJ Maxx and ULTA must be open, not DSG. It provides that TJ Maxx and ULTA "shall each be open or will simultaneously be open" with DSG. Then, in the second prong, the phrase "remaining LFA" refers to the LFA remaining after removing TJ Maxx and ULTA, and the subsequent phrase "excluding the LFA of the Demised Premises and any out-parcels" removes DSG's LFA from the 70% test. As DSG explains in its Reply brief, its construction is as follows:

(1) The first prong deals with TJ Maxx and ULTA, leaving out DSG and the rest of the Shopping Center; then

12

(2) The second prong identifies the "remaining LFA" as the total LFA except TJ Maxx and ULTA; then

(3) The modifier "excluding the LFA of the Demised Premises and any out-parcels" applies to the "remaining LFA" and carves out DSG and the out-parcels from that definition.

(Doc. No. 14, at 4). Therefore, DSG's interpretation contains no redundancy and Plaintiff's argument on this point fails.

Fourth, Plaintiff argues the term "remaining LFA" does have meaning within Plaintiff's interpretation of the Lease, because the Lease does not define the LFA occupied by TJ Maxx. However, as DSG points out, Exhibit A of the Lease does identify the proposed space to be occupied by TJ Maxx—21,858 square feet. (*See* Doc. No. 7-2, at 60). More importantly, even if the Lease did not identify TJ Maxx's LFA, it would not follow that TJ Maxx's LFA would become part of the "remaining LFA." The Court does not find Plaintiff's argument compelling.

Finally, Plaintiff asserts that, contrary to DSG's argument, its construction gives meaning to both prongs of Section 1.6(a). Plaintiff argues Section 1.6(a)(i) speaks to *who* must be a tenant, while Section 1.6(a)(ii) speaks to *how much* of the LFA must be under lease. However, as DSG points out in its Reply brief, Plaintiff's argument is irrelevant to the question of what the term "remaining LFA" describes. Moreover, it is clear from a reading of Section 1.6(a) that both prongs

address the "who" and the "how much." The first prong identifies TJ Maxx and the Additional Inducement Tenant (the "who") and specifies the Additional Inducement Tenant must operate in at least 10,000 square feet of LFA (the "how much"). The second prong requires that at least 70% of the remaining LFA of the Shopping Center must be open or must simultaneously be open with DSG (*i.e.*, the remainder after excluding TJ Maxx and the Additional Inducement Tenant) but excluding DSG and any out-parcels (the "how much"), and that the space must be occupied by retail businesses operated by "Required Tenants" (the "who"). Therefore, Plaintiff's argument is not only irrelevant but also incorrect.

Plaintiff's construction of the Initial Co-Tenancy Requirement is strained and inconsistent with the plain, unambiguous language of the Lease. By contrast, DSG's construction of the Initial Co-Tenancy Requirement is logical and gives meaning to each word of Section 1.6(a). Accordingly, the Court finds Plaintiff's sole claim for declaratory judgment is subject to dismissal as a matter of law.

## II. Plaintiff's Motion for Summary Judgment

For the reasons explained above, the Court finds Plaintiff's sole claim for declaratory judgment should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff's Motion for Summary Judgment and Brief in Support (Doc. Nos. 12, 13) address the same issues as the Motion to Dismiss. After reviewing Plaintiff's arguments in its Motion for Summary Judgment, the Court identifies no reason to

depart from its decision to dismiss Plaintiff's sole claim. Accordingly, Plaintiff's Motion for Summary Judgment is denied. Because it is not necessary to the disposition of this case, the Court declines to address either DSG's objections to the affidavit of James W. Dill (Doc. No. 16) or DSG's motion for relief pursuant to Federal Rule of Civil Procedure 56(d) (Doc. No. 17).

## CONCLUSION

For the reasons detailed above, Defendant's Motion to Dismiss Plaintiff's Petition for Failure to State a Claim (Doc. No. 7) is **GRANTED** and Plaintiff's Motion for Summary Judgment (Doc. No. 12) is **DENIED.** Defendant's Objections to the Affidavit of James W. Dill (Doc. No. 16) and Defendant's Motion (In the Alternative) for Relief Pursuant to Rule 56(d) of the Federal Rules of Civil Procedure (Doc. No. 17) are **MOOT**.

IT IS SO ORDERED this 27th day of September, 2017.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma